Filed 7/18/14  David H. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

DAVID H. et al.,

     Petitioners,

v.

THE SUPERIOR COURT OF CONTRA COSTA COUNTY,

     Respondent;

_____

CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,

     Real Party in Interest.

A141534

(Contra Costa County Super. Ct. Nos. J12-01693, J12-01694 & J12-01695)

In this consolidated writ proceeding, Eileen W. (mother) and David H. (father) seek extraordinary relief from the juvenile court order terminating reunification services with respect to their twin daughters, D.H. and Shannon H. (born Sept. 2002), and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[1]  In addition, mother seeks similar extraordinary relief with respect to her third daughter, Erica W. (born Jan. 1997).  Specifically, both parents argue that the juvenile court's finding that they received reasonable reunification services was not supported by substantial evidence.  Father additionally claims, under various rationales, that his

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.  All rule references are to the California Rules of Court.

1

reunification services should have been extended.  Finally, mother argues the impropriety of certain visitation orders entered by the juvenile court.  Seeing no error requiring reversal of the juvenile court's setting order, we deny the consolidated petition.

## I.  BACKGROUND

The three minors who are the subject of these proceedings came to the attention of the Contra Costa County Children and Family Services Bureau (Bureau) on December 12, 2012, after the police discovered that all of the utilities at their home had been turned off for several months.  At that time, Erica, D., and Shannon were living at the residence with Eileen W., David H. and their older brother Eric.[2]  According to Erica (then 15 years old), the family had been taking water illegally from the city for a long period of time, but they were finally caught and the water was shut off permanently.  In addition, they had been taking electricity illegally by "hijacking" it from various neighbors.  Erica reported that the family's gas was also illegally connected.  Since the water had been shut off, the family had been draining water from a neighbor's pool and boiling it for drinking and bathing.  Eric (then 17 years old) and Erica would frequently stay with friends so that they could shower.  Reportedly, the family owed approximately $4000 to PG&E.  However, they were living on only $700 per month in cash aid and food stamps, as both parents were unemployed.  According to their landlord, they had not paid rent in months and had no garbage service.  He believed they were keeping garbage in the garage.  Later, cleaners found numerous cats living in the garage among piles of

---

[2] Eric H. is Erica's sibling and the twins' half-sibling.  He turned 18 in May 2013 and became a nonminor dependent.  He is not involved in this appeal.  Eric W., the biological father of Eric and Erica, is also not a party to these proceedings.  When contacted regarding possible placement, he indicated that he had not seen the children for some time because, in the past, mother would make life miserable for the children after he visited.  He further stated that he would like to reconnect with Eric and Erica, but was not currently in a position to take custody.  According to Eric, his biological father had a history of homelessness and drug use and was not a viable placement.  David H. is the twins' presumed father, having been recognized as such during a prior dependency proceeding in 2008.

trash. Moreover, the gas stove and gas fireplace appeared to have been left continuously running.

When contacted by the Bureau, mother reported that she had a host of medical concerns for which she was taking prescription medication, including chronic obstructive pulmonary disease (COPD), asthma, high blood pressure, bronchitis, and migraines. Initially, when the home was red tagged on December 12, the Bureau believed that the family's instability was simply the result of lack of resources and mother's myriad health concerns. At that point, the police helped mother arrange temporary housing for Eric and Erica with friends. D. and Shannon (then 10 years old) were briefly taken into police custody, but soon placed with a neighbor. After this safety plan was created for the children, the parents were provided with referrals and encouraged to identify appropriate housing. Upon further investigation, however, the Bureau discovered that the family situation was more complicated than initially believed and that the family's lack of resources appeared to be attributable to drug use and an unstable home environment.

Eric reported, for instance, that mother was an active drug user. Specifically, he stated that, in 2009, mother had a prescription for oxycontin, but was using methamphetamine at the same time. Eric described being with mother at her doctor's office when she tested positive for methamphetamine. As a result, the doctor informed mother that she would no longer prescribe the oxycontin. According to Eric, since that time, mother had been buying Norco pills (a narcotic pain reliever) from a woman in Antioch. Eric explained that previously he had taken his mother to buy the pills, but that David H. was currently taking her. David H. did this even though the doctor had told him that there was no medical reason for mother to be taking pain medication. Eric further stated that, in addition to the Norco pills, mother continued to use methamphetamine. He was aware of her drug activity because he had been paying the family bills for the last two years and had noticed money disappearing. Most recently, mother admitted her methamphetamine use to Eric in December 2012 when she wanted to " 'stay up' " one day and needed $20. According to Eric, this was a conversation that he had with mother

3

on "numerous" occasions. In addition to the methamphetamine and Norco pills, the twins confirmed that mother sometimes drank alcohol.

D. and Shannon also reported that mother and father were verbally abusive to each other and that father had hit mother in the past. Moreover, Erica told the social worker that mother was verbally abusive to her, Eric, and David H. In fact, as the social worker discovered, restraining orders had been issued previously to prevent father from having contact with mother and the children. Further, mother had been convicted twice in 2004 for inflicting corporal injury on a spouse or cohabitant (Pen. Code. § 273.5, subd. (a)), and father had been convicted in 1988 for battery (Pen. Code, § 242) and in 2007 for violating a court order to prevent domestic violence (Pen. Code, § 273.6, subd. (a)). In addition, in 2003, mother was arrested after she hit, kicked, and stabbed father in the presence of the children. Reportedly, this assault began after mother learned that father had spoken to a women in the park while on an outing with the minors. Mother denied stabbing father, even after being confronted with evidence of the wound on his thigh.

When the twins were temporarily placed with their neighbor, it was discovered that they did not have anything to wear, as the clothes provided by their parents were mostly too small and had to be discarded. Further, during her contacts with the parents, the social worker experienced them as scattered and disheveled, with stained clothing and a dirt-like substance on their hands and under their nails. Mother presented as jittery and somewhat aggressive at times. Father seemed to have difficulty tracking conversation. Both parents appeared on several occasions as if they were recently under the influence of something.

With respect to the circumstances leading to the Bureau's involvement, Eric stated that, about two weeks prior to the police intervention, they had a family meeting to discuss their situation. Mother reportedly made the twins confront their father regarding his lack of employment. Then, after Eric and mother began to argue about mother's drug use, mother punched Eric on the side of his face, called him a " 'faggot,' " and accused him of " 'butt fucking' " father. On December 12, 2012—the date the Bureau became involved—mother had been over an hour late to pick up Eric and Erica from school. She

4

began arguing with Eric in the car, stating that he had called her a slut in front of David H. during their previous altercation. Eric denied this and, when he reminded mother of the comments that she had made about him, mother slammed on the brakes. She then began driving erratically while attempting to hit Eric, who was in the seat behind her. Erica stated that she and the twins screamed at their mother to slow down, but she did not listen. At the next stop light, all of the children got out of the car, and Eric opened his mother's door in an attempt to put the car in park. Mother, however, was screaming at Erica and the twins to get back in the car, so they re-entered the vehicle. Mother then sped off, leaving Eric on the side of the road. At this point, Eric called the police who ultimately discovered the lack of utilities at the house.

Both Eric and Erica reported being " 'terrified' " to return to mother's care due to the ongoing chaos, drug use, and verbal and physical abuse. According to Eric, this type of chaos has been going on his whole life. And, indeed, there were 26 prior referrals regarding the family from 1988 through 2012, including two which resulted in formal dependency proceedings. Specifically, in September 2002, dependency petitions were filed with respect to Shannon and D. after they tested positive for amphetamines at birth. Family maintenance services were provided from October 2002 to October 2003, when dependency was dismissed. Thereafter, dependency proceedings were commenced with respect to all four minors in October 2006 based on allegations of physical abuse by mother against Eric. Reportedly, mother had punched Eric twice in the back and hit him with a belt three times after he had run into one of his sisters on his scooter. Eric remained out of the home until August 2007, while the girls received family maintenance services. Thereafter, all four minors received family maintenance services until dependency was again dismissed in May 2008. According to reports in connection with this 2006 dependency, mother made minimal progress with her court ordered services during the proceedings, and, in particular, failed to engage in any anger management or domestic violence services.

Based on all of this information, the Bureau filed petitions pursuant to subdivision (b) of section 300 on December 27, 2012, asking that the minors be officially

5

detained. Formal detention by the juvenile court occurred the next day, with the minors remaining in their nonrelative extended family member placements. (See §§ 361.2, subd. (e)(3), 362.7.) Mother reportedly had certain cognitive delays based on a brain injury she sustained in 1997. Thus, on February 13, 2013, the juvenile court appointed a guardian ad litem for her. After a number of continuances, jurisdiction was established by the juvenile court on March 20, 2013, based on mother's substance abuse and father's failure to provide safe and adequate housing for the children.

In its dispositional report filed with the court on May 6, 2013, the Bureau reported that the twins had been moved to a licensed foster home in March 2013, while Eric and Erica continued in their placements with separate nonrelative extended family members. All four minors were located within five miles of each other, and had the ability to visit often. Both Eric and Erica were described as strong students, and the twins were reported to be doing well in school. At that time, Erica was having regular phone contact with mother, and the twins were visiting with both parents. Visitation by the parents was reported to be inconsistent, however, with the parents at times forgetting to confirm and at other times cancelling due to illness. The Bureau also noted that mother was scheduled to have open heart surgery in the near future.

The Bureau recommended family reunification services to deal with the parents' anger management and domestic violence behaviors, mother's substance abuse, and father's codependency issues. Specifically, with respect to father, the report concluded: "[David H.] struggles with codependency behaviors that are jeopardizing his children's safety. [He] is in a relationship in which he is being controlled and manipulated by [mother] who is affected with a pathological condition (drug addiction). [David H.] places a lower priority on his children's needs as well as his own needs. At this time, [he] is excessively preoccupied with the medical needs of [mother]."

At the dispositional hearing on May 6, 2013, the juvenile court ordered Eileen W. and David H. to comply with the proposed reunification case plan. For both parents, this included obtaining a stable and suitable residence; completing a domestic violence program; engaging in individual, couples, and family therapy; completing a parenting

6

class; participating in random drug testing; attending Alcoholics Anonymous or Narcotics Anonymous (AA/NA) meetings; and visiting regularly with the children. Mother was additionally ordered to complete an inpatient substance abuse treatment program, while father was ordered into outpatient substance abuse treatment. With respect to visitation, mother and father were granted visitation a minimum of one hour twice per month, with the Bureau to consider the minors' wishes in the administration of that visitation in accordance with existing case law. In addition, through mother's upcoming hospitalization, the juvenile court authorized additional unsupervised visitation for the twins twice a week for up to two hours, so long as it did not interfere with their school attendance. Father was required to be present at all visits with mother. Finally, a court appointed special advocate (CASA) was appointed for Erica.

On July 10, 2013, the juvenile court held a hearing regarding visitation issues. According to the Bureau, the parents were seeking more visitation with the twins. However, scheduling the court-ordered twice per month visitation had already proved challenging. Mother was hospitalized from May 8 through May 10, and again from June 21 to June 24. Additionally, she had multiple doctor appointments and days when she did not feel well. The twins were engaged in a host of summer activities. Moreover, visitation had been emotional for the twins, and they indicated to their foster parent that they wanted to have something to do after the visits "to distract them from their feelings." When prompted by their foster mother to call their parents, the twins would often ask to " 'do it later.' " Further, the parents had not provided evidence that they were engaged in any of their court-ordered services, other than drug testing. And, although mother's drug tests continued to be positive for various substances, she had not provided the social worker with a list of prescribed medications from her doctors as required by the case plan. Under these circumstances, the juvenile court declined to change its visitation order.

By the six-month review in November 2013, although the parents had moved into a home with running water and electricity, they had otherwise made little progress on their reunification plan. Mother had missed five scheduled drug tests between April and

7

June 2013. When she did test, she tested positive for opiates and/or benzodiazepines. She ceased testing after June 2013. In addition, mother had open heart surgery in August 2013, after several postponements due, in part, to concerns regarding the impact that her substance abuse and smoking might have on the outcome of the surgery. Mother had not, however, provided the social worker with any information about her medical condition or her prescribed medications. During family visits and phone calls, mother's health was the primary focus. Indeed, during one conversation, David H. indicated that he had been unable to attend a parenting class because he had to care for mother, stating " 'I am all she has.' " The social worker reminded him that his children needed him as well.

As of October 2013, David H. reported that he and mother were attending a parenting class and that he had resumed drug testing after initially having a problem with the testing procedure.[3] However, the social worker had not received any documentation indicating that either parent was engaged in court-ordered services (other than drug testing) or had addressed their issues of substance abuse and codependency. Moreover, the social worker questioned mother's priorities after learning that she and David H. had gone out to dinner for mother's birthday on September 18, 2013, but were apparently unable to participate in court-ordered services.

In the meantime, the three minors were reported to be making progress both emotionally and academically. Erica was enjoying high school and was engaged in extracurricular activities at school. Shannon was exploring many interests, including playing the piano and a wind instrument. D. was enjoying the additional freedoms of being a preteen, such as walking to and from school with other children.

Although approved for unsupervised visits, Erica reported that she was spending little time with her mother and had limited phone contact. The twins, for their part, were struggling with feelings of loyalty and being conflicted about contact with their parents. They made excuses not to accept or return phone calls from their immediate family and continued to ask for something to do after such calls so that they could be distracted.

---

[3] The one drug test he did complete on June 10, 2013, was negative.

Moreover, they expressed to their therapists, the social worker, and their foster parent that they did not want to call their parents between visits. The twins further reported that their relationship with their father was limited because their mother had kept their father from them. Additionally, Shannon and D. claimed that " 'the mother we are seeing now is not the real way she acts. This is the nice lady, she is mean and then she will be nice and fake after being mean.' " They recalled getting hit over the head with alcohol bottles, being woken up at night by their mother when she was using drugs, and having their bedroom door kicked in. After reviewing the available information, it was the social worker's opinion that the twins appeared to have been "terrorized" by their mother in the past.

At the six-month review on November 21, 2013, the juvenile court ordered six more months of reunification services for both parents. Visitation was continued a minimum of one hour twice per month, with the Bureau to consider the minors' wishes in the administration of the visitation in accordance with existing case law. CASA workers were appointed for D. and Shannon.

Unfortunately, as the 12-month review approached, there had been little change in the parents' engagement in services. Both parents did complete a parenting class and visited with the children. However, mother failed to appear at six scheduled drug tests. And, when she did drug test, she continued to test positive for a variety of substances, including alcohol on December 3, 2013. Importantly, mother had still failed to provide the social worker with documentation regarding her prescribed medications. Further, although mother provided a drug and alcohol assessment to the social worker, the self-reported assessment was of questionable validity as mother stated that she had no problem with substances, had not used alcohol in ten years, and had not been evaluated for substance abuse since 1987, assertions directly contradicted by significant evidence in the record. In addition, mother continued to have health concerns and was scheduled for neck surgery on February 26, 2014, to remove pressure on her spinal cord. She was taking pain medications due to this condition and was attending a pain management clinic.

Father had consistently tested negative for drugs and alcohol, with two missed tests. He also completed a drug and alcohol assessment which stated that he had no real problem and that treatment was not indicated. However, there is no evidence in the record that either parent ever engaged in individual counseling, attended a domestic violence program, or attended AA/NA meetings. They did attend some family therapy sessions as a couple, without the minors.

Erica, D., and Shannon, in contrast, were all reported to be doing exceptionally well in school and to be engaged in afterschool activities. Erica had recently turned 17 and was planning a tour of California colleges with her CASA. Shannon's individual therapist reported that she was progressing in her expression of her needs and feelings. D., on the other hand, was still having difficulty discussing her parents and past events.

During this period, the family engaged in therapeutic visits twice per month. However, at a session in early February 2014, mother was asked to leave 15 minutes into the session because she was having difficulty staying on task and following the rules. Thereafter, Shannon and D. were able to tell father their thoughts and feelings that he did not protect them from their mother's negative behaviors. The session was reported to be very exhausting and emotionally draining and, afterwards, the twins stated that they were no longer willing to attend therapeutic visits with their parents. The family therapist was therefore meeting separately with the parents and the twins.

Indeed, Shannon and D. seemed to be retreating more and more from their parents as they were able to process and voice the trauma that they had experienced while in their parents' care. They both wrote letters to the court stating that they wanted to remain with their current foster family. Specifically, D. stated: "I am an 11 year old girl who has been in foster care for a year. I'm with a family that I love and want to stay with. It would be horrible if I had to go back to my biological parents because[] my parents were very abusive mentally and physically and my dad was not a part of my life. . . . I want to stay where I am [where] I finally have a hope to fit in." Similarly, Shannon wrote: "I've been in foster care for over a year. My bio mom did a lot of bad things. She smoked marijuana and did other pill bottle drugs. Because of this she had mood swings. She

10

would get really mad at my dad. She would get mad at us for no reason. She hit us with belts, smacked us, and even threw pill bottles at us. . . . My mom and dad would get in physical fights where they were literally choking each other. But [what] was worse they fought in front of our face. Sometime[s] when my brother and sister weren't there I tried to break it up. I'm so glad I don't have to deal with that anymore. I'm with a family that loves and cares about me unconditionally. I now believe in god, and am very healthy, now that I have a FAMILY."

In its 12-month review report dated March 6, 2014, the Bureau initially requested that six more months of reunification services be provided to the parents so that therapeutic services could be continued for the family. Minors' counsel, however, contested this recommendation. While the contested hearing was pending, the Bureau changed its position, seeking termination of reunification services for both parents. According to the Bureau, the twins had met with the family therapist on several occasions and had ample time to process their decision with their individual therapists regarding terminating contact with their parents. They remained unable or unwilling to participate in family therapy. Moreover, Erica was also unwilling to return to her mother's care, and her CASA recommended that she remain in her current placement where she was thriving. Under such circumstances, the Bureau opined that granting an additional three months of services would not significantly change the outcome of the proceedings. The parents objected to the Bureau's new recommendation, and a contested 12-month review hearing was held on March 24 and 28, 2014.

At that hearing, the social worker testified that mother had not provided her with any documentation regarding her medical issues until she produced a list of her prescribed medications earlier that month at the hearing on March 6, 2014. The social worker had no documented information that mother's open heart or neck surgery affected her ability to enroll in a domestic violence program or individual counseling. Further, mother never reported that she was having difficulty accessing any of the services required by her case plan. The social worker was aware, however, that mother had been unable to enroll in an inpatient substance abuse treatment program due to her health

11

issues and medications. Father testified that he had not had time to engage in individual counseling, a domestic violence program, or AA/NA meetings because he had been too busy working and taking care of mother. He further stated that he and mother had driven 30 minutes to attend a two hour parenting class approximately seven times in October and November 2013. Finally, and most significantly, father also testified that he did not believe that mother had a severe substance abuse problem or that she required substance abuse treatment. He stated that he had never known mother to use methamphetamine or purchase prescription medication on the street and that, to the extent the minors reported otherwise, they were lying. He did admit that the minors had witnessed domestic violence between him and mother.

At the conclusion of the contested hearing, the juvenile court terminated reunification services for both parents and scheduled a permanency planning hearing for July 24, 2014. In reaching its decision to terminate services, the juvenile court was clearly swayed by the fact that this was the third dependency proceeding involving the parents, and yet the same issues were presented and "nothing" had changed. Moreover, the juvenile court found that there was no medical reason justifying mother or father's failure to participate in services. Finally, the wishes of the three minors (who the judge described as "amazing and remarkable young people") were also an express factor in the juvenile court's determination. With respect to visitation pending the permanency planning hearing, the juvenile court ordered a minimum of one hour per month, with the Bureau to consider the minors' wishes in the administration of the visitation in accordance with existing case law.

Mother and father both filed timely notices of their intent to file writ petitions, and the petitions themselves were filed on May 9 and 16, 2014. (Rules 8.450(e), 8.452.)

## II.  TERMINATION OF REUNIFICATION SERVICES

**A.**    *Reasonable Services*

Both parents argue that reunification services should have been continued at the 12-month review hearing on March 28, 2014, because reasonable services had not been provided to them.  (See § 366.21, subd. (g)(1) [services may be continued at 12-month hearing if the court finds that reasonable services have not been provided]; § 366.21, subd. (g)(1)(C) [permanency planning hearing pursuant to section 366.26 may not be set "unless there is clear and convincing evidence that reasonable services have been provided or offered"].)  Specifically, mother claims that the Bureau failed to provide services tailored to meet her special medical and developmental needs.[4]  According to father, mother's mental and medical status obligated him to devote his time to her care, and the Bureau made no effort to assist him in caring for her so that he could participate in reunification efforts.

Undoubtedly, family reunification services play a critical role in dependency proceedings.  (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563; see generally § 361.5.)  Such services "implement 'the law's strong preference for maintaining the family relationship[] if at all possible.' "  (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 (*Elizabeth R.*).)  Moreover, to maximize the chances of family preservation, reunification services should be tailored to the specific needs of a particular family.  (*Elizabeth R., supra*, 35 Cal.App.4th at p. 1787*; David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793.)  Thus, the adequacy of a reunification plan and the reasonableness of the reunification efforts made by a child welfare agency must be judged according to the circumstances of each case.  (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)

However, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect."  (*In re Misako*

---

[4] Mother also contends that the juvenile court's March 6, 2014, visitation order amounted to a denial of reasonable services.  We consider the propriety of this order in Section III, *post*.

13

*R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*); see *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)  Thus, when considering the adequacy of reunification services, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako R., supra*, 2 Cal.App.4th at p. 547; see also *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425-1426.)  To support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

Finally, "with regard to the sufficiency of reunification services, our sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered."  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)  In doing so, we "must view the evidence in a light most favorable to the respondent.  We must indulge in all legitimate and reasonable inferences to uphold the verdict.  If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*Misako R., supra*, 2 Cal.App.4th at p. 545.)

When considered in this context, we believe that the record contains substantial evidence that the services provided to both parents were reasonable.  In its dispositional report, the Bureau identified the problems which led to the loss of custody as the parents' anger management and domestic violence issues, mother's substance abuse, and father's codependent behaviors.  The reunification plans adopted for both parents contained myriad services designed to remedy these problems.  And the social worker supplied appropriate referrals for service providers on a number of occasions, including referrals for weekend services.  This system appears to have been effective, as the parents were

14

able to find and complete a parenting class based on the referrals given.  Further, although clearly a challenge due to the parties' differing schedules and needs, the social worker bent over backwards to provide effective visitation, including therapeutic sessions in an attempt to improve family functioning.

Although both parents complain that the services provided failed to take into account mother's admittedly significant medical needs, the record is clear that mother never provided any information to the social worker regarding her medical condition or her need for any specific accommodations due to her medical issues.  Rather, mother was in court four days after being discharged from the hospital in connection with her neck surgery, was out to dinner three weeks after her open heart surgery, was able to participate in and successfully complete a parenting class in October and November 2013, and was able to travel to drug test and to visit with the minors.[5]  At the conclusion of the contested 12-month review hearing, the juvenile court expressly found "that there is no evidence before the Court that mother is bedridden, that father can't leave the house when mother is there so that father can participate in services.  There is no evidence that mother cannot leave the house to participate in services."  The court went on to conclude that, although mother's "medical conditions have been used and touted as the excuse for her lack of participation, quite frankly, the evidence suggests that she simply denies that she has any problem."

The record also shows that mother never expressed to the social worker that she was having any difficulty accessing  her court-ordered services.  Further, although father did indicate, at one point, that he did not have time for a parenting class, he was later able

---

[5] Similarly, although a guardian ad litem was appointed for mother in these proceedings, there was no evidence that her cognitive deficits were of a such a magnitude that they impeded her ability to complete her reunification plan.  To the contrary, as stated above, mother was able to drug test, successfully complete a parenting class, and engage in visitation with the minors.  Further, prior to their removal, she was able to drive her children home from school.  And, she was able to complete a substance abuse assessment and manage her medical care.  Finally, when the Bureau first became involved with this family in November 2012, mother was looking for a job as an apartment manager or a process server, both jobs she had held in the past.

15

to complete this requirement. Finally, though father did mention to the social worker that he was having some difficulty accessing an individual therapist, this comment was made only one month before the 12-month review hearing. As has been often remarked, if the parents felt during the reunification period that the services offered to them were inadequate, they had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

The evidence is more than substantial that the parents were provided with reasonable services in this case.

**B.** *Substantial Probability of Return*

Pursuant to subdivision (g)(1) of section 366.21, the juvenile court may extend reunification services for up to six additional months at the 12-month hearing if "there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time." In no event, however, may such services be continued for a period longer than 18 months from the date the child was originally taken from the physical custody of his or her parent. (*Ibid.*) Moreover, in concluding that there is a substantial probability of return, the juvenile court is required to find that the parent: (1) "has consistently and regularly contacted and visited with the child;" (2) "has made significant progress in resolving problems that led to the child's removal from the home"; and (3) "has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A), (B), (C).)

In the present case, the minors were detained on December 28, 2012, and thus services could have been continued, at most, for three more month from the March 28, 2014, 12-month review hearing. Father contends that the juvenile court should have extended his reunification services to an 18-month hearing because there was "a substantial probability" that the twins could have been returned to his care during this extended period of time. Specifically, he claims that he had visited regularly with the

twins, had met the objectives of his case plan, and had made significant progress resolving the problems that led to the twins' initial removal.

We disagree. It is true that, at the time of the 12-month review, father had consistently visited with the minors and was maintaining a home with running water and electricity. However, D. and Shannon seemed to be retreating from their parents as they were able to process their past trauma and had indicated that they did not want further contact. Moreover, we note that working utilities are only one small part of providing a safe and stable home. The Bureau identified father's codependency as one of the primary obstacles to reunification faced by this family. Yet father failed to engage in the very services—individual counseling, domestic violence treatment, and AA/NA meetings— that might have helped him resolve this issue. Instead, the record reflects that father purchased Norco pills for mother that were not medically indicated; that he was excessively preoccupied with mother's medical needs to the detriment of his children; and that he allowed mother to keep him from playing an active role in his daughters' lives. Indeed, father testified at the 12-month hearing (in front of the minors and despite overwhelming evidence to the contrary) that mother did not have a substance abuse problem and that, to the extent the minors reported otherwise, they were lying. That father maintained this position despite the fact the twins had finally been able to confront him in family therapy regarding his failure to protect them from mother is even more telling. Clearly, as the juvenile court noted, "[n]othing has changed" for these parents. Under such circumstances, there was no substantial probability that the twins could have been returned to father's care if services were extended. No meaningful progress had been made, and father showed himself patently unable to provide for the twins' safety, protection, and emotional needs.

C.      *Extension of Services Pursuant to Section 352*

Father next argues, based on *Elizabeth R., supra,* 35 Cal.App.4th 1774, that this is an "unusual" case where reunification services should have been continued beyond otherwise applicable deadlines pursuant to section 352. *Elizabeth R.* involved a high-functioning, bipolar mother who was psychiatrically hospitalized for the bulk (all but five

17

months) of her reunification period. (*Id.* at pp. 1777-1778.) She was released just five weeks prior to the 18-month review. (*Id.* at p. 1789.) However, before and during her hospitalizations she worked diligently on the components of her case plan and had substantially complied with all required elements. (*Id.* at pp. 1779-1782, 1787, 1792.) Moreover, the visitation that she was permitted went well and her children were happy to see her. (*Id.* at pp. 1780, 1782, 1794.) And, there had never been any allegations that the minors were abused or neglected while in the mother's care. (*Id.* at p. 1778-1779, 1794.) At the 18-month review hearing, the juvenile court noted the mother's significant progress, but felt it had no choice other than to terminate reunification services since it would have been premature to return the minors given the mother's recent release from the hospital. (*Id.* at pp. 1782-1783.) The appellate court reversed, holding that, in "unusual" circumstances, section 352 may be used as a vehicle for continuing reunification services past the 18-month deadline. (*Elizabeth R., supra,* 35 Cal.App.4th at pp. 1797-1799.)

Father's assertions to the contrary notwithstanding, the circumstances of this case are readily distinguishable from those described in *Elizabeth R.* Here, mother was hospitalized for less than two weeks of the reunification period. And, as the juvenile court properly found, there is nothing in the record to indicate that mother's medical issues precluded mother or father from participating in reunification efforts. In addition, neither parent had substantially complied with their reunification plan, with entrenched issues of domestic violence, substance abuse, and codependency remaining essentially unaddressed. Moreover, the minors in these proceedings had been effectively "terrorized" for years while in the care of their parents and expressly did not want to return to their care.

Most importantly, section 352 permits a hearing to be continued beyond its statutory time limits only if such a continuance is not "contrary to the interest of the minor." (§ 352, subd. (a).) And, "[i]n considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor

18

of prolonged temporary placements." (*Ibid.*) Given the minors' extensive history of abuse and neglect at the hands of their parents, the twins' emotional fragility, and the positive gains made by the girls in their stable placements, the record in this case clearly supports the juvenile court's conclusion that delaying permanency for these minors would have been detrimental. As the juvenile court opined: "I think that these girls, who appear here today, including Erica, deserve permanency. They deserve to move on. They deserve to feel secure and like they don't have to always have to look over their shoulder and wonder whether or not they are going to be ripped from where they are and returned to the same dysfunction in which they managed to survive for so many years." Under such circumstances, refusing to extend the statutory timeframes for reunification was entirely proper.

### III.  VISITATION ORDERS

As a final matter, mother challenges the visitation orders entered by the juvenile court on March 6 and 28, 2014. On March 6—while the 12-month review was pending—counsel for Shannon and D. requested that the twins be given the right not to attend therapeutic visitation or have telephone contact with their parents. According to the minors' attorney, contact with their parents was "very detrimental" to the girls and they felt "very strongly" that they did not want it. The juvenile court agreed to honor the twins' request pending the contested hearing, holding that visitation during this interim period would be in accordance with *In re Danielle W.* (1989) 207 Cal.App.3d 1227 (*Danielle W.*), *In re Chantal S.* (1996) 13 Cal.4th 196 (*Chantal S.*), and *In re Julie M.* (1999) 69 Cal.App.4th 41 (*Julie M.*). The court explained it's visitation order to Shannon and D. as follows: "Which means, girls, that if you do not want to participate in the visits, therapeutic visits or phone contact, you don't have to. And then I will weigh all of the evidence at that hearing and then make whatever orders come from what's presented to the Court at that time."

At the conclusion of the contested 12-month review hearing on March 28, 2014, the juvenile court made a similar visitation order. Specifically, the court ordered that visitation for all three girls be supervised and a minimum of once per month for both

parents. However, in implementing this visitation order, the Bureau was expressly directed to consider the children's wishes and input from minors' counsel and any treating therapists pursuant to *Danielle W.*, *Chantal S.,* and *Julie M.* Again, the juvenile court elaborated on its visitation order, stating: "So what that means, so the girls understand, is that it's up to you. No one is going to force you to have these visits, and if you don't want it, or if your therapist believes it's not in your best interest, you don't have to have those visits." The juvenile court went on to conclude, in light of the evidence presented at the contested hearing, that there should be no contact other than the monthly visits—such as telephone or electronic communication—unless requested by the children.

Mother argues that these visitation orders improperly suspended visitation without the requisite finding of detriment. Additionally, she claims that, by giving the girls discretion regarding whether the visits occur, they represent an improper delegation of judicial authority to the minors. We see no error on either ground.

When a child is placed in out-of-home care after a dispositional hearing and the court orders reunification services for the parents, the court's order must provide for visitation, which should be "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A); see § 362.1, subd. (a)(1)(B) ["[n]o visitation order shall jeopardize the safety of the child"].) Similarly, when reunification services have been terminated and the matter referred for a permanency planning hearing, the juvenile court is required to permit the parents to continue to visit the child pending the hearing "unless it finds that visitation would be detrimental to the child." (§§ 361.5, subd. (f), 366.21, subd. (h).) The determination of the right of visitation is part of the judicial function and must be made by the court. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008-1009.) Thus, the juvenile court may not delegate to any third person, including the child, a social worker, or a therapist, unlimited discretion to determine whether visitation is to occur. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317-318 (*S.H.*); *In re Christopher H., supra,* 50 Cal.App.4th at p 1009.)

A visitation order, however, may properly permit consideration of a child's wishes regarding visits with a parent. "[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*S.H., supra,* 111 Cal.App.4th at p. 317.) The court's duty to focus on the best interests of the minor includes considering "the 'possibility of adverse psychological consequences of an unwanted visit between [parent] and child.' " (*Julie M., supra,* 69 Cal.App.4th at p. 50.) Thus, a child's aversion to visiting a parent may be a dominant factor in administering visitation, as long as it is not the sole factor. (*Id.* at pp. 48, 51 [juvenile court abused its discretion in giving children absolute discretion to decide whether visitation occurred].)

In sum, when crafting a valid visitation order, "[t]he juvenile court must first determine whether or not visitation should occur . . . and then provide the [child welfare agency] with guidelines as to the prerequisites of visitation or any limitations or required circumstances." (*Danielle W., supra,* 207 Cal.App.3d at p. 1237, fn. omitted.) We review the juvenile court's order setting visitation terms for abuse of discretion. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) Thus, "[w]e will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination." (*Ibid.*)

In these proceedings, both the March 6 and the March 28 visitation orders were properly crafted and well-supported by the evidence.[6] The juvenile court did not grant the girls complete and total discretion to determine whether visitation would occur. Rather, it ordered regular visitation and then balanced the parents' right to visit with the

---

[6] Contrary to mother's assertion, no showing of detriment was required in this case because the court never denied visitation. (Compare *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.) Instead, at both the March 6 and the March 28 hearings, it ordered that visitation continue in accordance with the holdings of *Danielle W.*, *Chantal S.,* and *Julie M.*, that is, that the Bureau take into account the wishes of the minors, and the input of the minors' therapists and counsel, in the administration of the court-ordered visits and/or phone calls.

minors' emotional well-being by allowing the children to refuse a particular visit. When the twins indicated that they no longer wanted to participate in visitation, the therapists and social worker gave them time to consider their decision and attempted to re-engage them. Indeed, the twins were actively involved with processing their emotions regarding visitation with their individual therapists, the family therapist, and the social worker. Thus, the juvenile court appropriately acted in the girls' best interests by making their input on visits a dominant factor, but not the sole one, in implementing the visitation order. (Compare *Danielle W., supra,* 207 Cal.App.3d at p. 1238.)

In addition, there was significant evidence in the record that it would be detrimental to the girls to force visitation. The twins, particularly, were clearly very emotionally fragile after years of dysfunction in the family home. For instance, D. and Shannon bonded very quickly to the neighbor they were first placed with, despite the fact that they had only known her for a short time. After they were removed from this initial placement, the twins were extremely emotional and upset to the point that the social worker had to request assistance from emergency mental health services several times, and hospitalization was seriously considered for both girls due to their threats of self-harm. Further, the social worker testified that the twins needed a significant amount of control over visitation in order to reduce the anxiety caused by contact with their parents. Thus, the visits were only to be supervised by a social worker that they knew; the girls entered the visitation room first so that they could control where they sat relative to their parents; the girls did not want to be touched, hugged, or whispered to during visits; and there were hand signals they could use to indicate to the social worker that they wanted to end a visit early. Further, D. and Shannon reported not wanting to visit in their parents' home after they noticed a hole in the wall which made them remember past fighting and seeing family members punch the walls with their fists. Visits therefore occurred at the Bureau's offices. Both twins were also reported to struggle after phone calls with their parents and stated that they liked to talk to them only when they knew they would be distracted afterwards by some activity. Finally, the girls' individual therapists and the social worker all believed that forcing visitation would be detrimental to the girls.

22

Given these facts, we find that no abuse of discretion has occurred. In reaching this decision, we echo the conclusions of the *Danielle W.* court: "[I]t was reasonable for the juvenile court to believe, under the circumstances of this case, that forced contact would not be beneficial. In considering the best interests of the child, while still recognizing parental visitation rights, the juvenile court did in fact order visitation, under the one circumstance that would offer the best possibility that such visitation would be beneficial—when the child desired such contact." (*Danielle W., supra,* 207 Cal.App.3d at pp. 1238-1239.) The visitation orders were not meant to punish the parents, but were a proper means for the juvenile court to protect the minors' psychological well-being. (See *id.* at p. 1239.) We see no error.

## IV. DISPOSITION

The consolidated petition is denied on the merits. (See § 366.26, subd. (l)(1)(C), (4)(B).) Because the permanency planning hearing in these matters is set for July 24, 2014, this opinion is final as to this court immediately. (Rules 8.452(i), 8.490(b)(2)(A).)

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

23